We will hear argument next in No. 23-1687, Mitek Systems v. USAA. Mr. Mack, thanks to you and everybody for your patience on the long argument while you  Good morning. May it please the Court, Brian Mack on behalf of Appellant, Mitek Systems, Inc. We are back before you once again on an expanded record this time relating to this declaratory judgment action and in particular whether Mitek has a reasonable potential for claims of direct infringement, indirect infringement, or indemnification liability. Now we only need to show one of those three alternative bases and we believe that there is sufficient evidence in the record now post remand to find a reasonable basis on all three grounds. Can I ask you this question? Do you have a view about whether it is permissible to jump right to the discretion aspect without deciding the underlying case or controversy issue? There is some Supreme Court case law, maybe most recently, the Sinochem case, but going back to Roorgas, that says in general you have to decide subject matter jurisdiction, which would include case or controversy first, but there are some exceptions. Personal jurisdiction is an exception. Abstention is an exception. As long as you stay away from the merits, maybe, you can go right to a ground for dismissing that doesn't involve dismissing on the merits without deciding case or controversy. Do you have a view about this? I don't believe that's been raised in any of the briefing and we haven't taken a position on that to date. In this case, we think there are not well-founded reasons for the court to decline jurisdiction, so we think even if you did reach that issue, it should also be reversed. There's multiple errors that the district court committed. Let me ask you, you referred earlier when you got up to direct infringement and indirect infringement, meaning inducement and contributory infringement, and then, of course, the indemnification issue. Looking at those four, direct, inducement, contributory, indemnification, if you had to hang your hat on one as being your strongest one, and you could only argue that one, which one would you pick? I suspected that we may have received that question. I believe the direct infringement claim is fairly clear cut because the district court completely ignored the Fernandez Declaration. That's out of Appendix 1643. It's undisputed that MyTech, like every software company, tests all the elements, at least all the elements under the USAA's construction of the claim terms in its facilities in San Diego, and Mr. Fernandez explains that they test the entire mobile deposit system on real-world Android and iOS devices. You hang your hat on the testing. The testing. The only arguments contrary to why that wouldn't provide standing, according to the USAA and the district court, they said that there's no alleged harm associated with the testing, but there's no requirement of harm according to the district court. Was there any reason for the other side to know that you were doing this testing on devices at the time you filed your complaint? That's not required under the post-metamune standard. We have the Arrowhead case that says, quote, under the law, a court may find clear basis for reasonable apprehension in all the circumstances, even when a patentee first learns of plaintiff's conduct upon receipt of the complaint. That's actually a pre-metamune case under the stricter standard. The patentee has never needed to know about the infringement in order for there to be declaratory judgment standing. It's just not a relevant inquiry, and even if it were relevant, it's definitely not a dispositive inquiry. What about an affirmative act by USAA? Is that part of the inquiry? There's many affirmative acts here. We have, from the last time we were before a different panel, but with Judge Toronto, there's the letter-writing campaign to all of our customers. There's the indemnification request. Right, but an affirmative act directed at you, or that's something that you can fairly say is connected to being directed? USAA served us with Rule 45 subpoenas in each of the cases. We were present at the Wells Fargo case where we actually witnessed how central MySnap, our software, was to— Did they ever ask in those subpoenas, hey, are you doing any testing? The subpoenas, I don't believe, ever reached the issue of testing, but it's common sense that software companies test their products. So the real question here is whether there would have been a reasonable potential for direct infringement claims to be brought. There's been lots of cases that this circuit has affirmed billions of dollars in damages based on design and testing in California, like the Carnegie Mellon case. So there can be a large amount of damages associated with testing and designing products. So I think one of the things the other side says is, well, testing Vellnan is not the question. The question is whether there would have been testing that included all the elements of the claim, which I guess include actually having a depository institution. Yes, we addressed that actually in our yellow brief. The depository claim, there's only some of the patents use the word depository. That can be defined as a third party under the actual description within the patent of that one that uses depository. And Fernanda's declaration clearly explains that we test the entire system from beginning to end. So there's actually two pieces of the MyTech solution. We've been focusing on the MySnap piece that's on the cell phone. MyTech also has a mobile deposit server. It's an image processing server. That's the server that's actually typically situated at the bank. So there's actually two pieces of the MyTech equipment here. There's the software on the phone that sends the image to a mobile deposit server that's also running MyTech software that's at the bank. So the testing in San Diego is testing the complete system. It's clear from the Fernanda's declaration that the district court doesn't even reference in its opinion that we test the complete system from beginning to end, from the mobile device to the servers, the servers that are usually situated at a bank. But in this situation, they're situated in San Diego at our lab. So the depository, even in the claims, the few claims that do say you're sending it to a depository, that depository would still be satisfied by the third party server. Even though it's not a bank? Even though it's not a bank because the patent defines it as it could be a third party. It doesn't have to be a bank. It could be a third party that's acting on behalf of a bank. So the bank could have outsourced that. Oh, but is your third party acting on behalf of a bank? We do our testing on behalf of banks. We will work directly with banks through troubleshoot and we will set everything up in our labs and we will emulate the same network environment that the bank has and we will perform all of the steps in San Diego. It doesn't feel to me quite like your own lab is on behalf of the bank just because you're developing a product that you would like to sell to the banks. The claim limitations that use the depository language, it's really the transmitting that's part of the claim. It's the transmission, but then it says to a depository. And you said not all of the claims have the depository language. Not all of the claims have the depository language, no. It's only some of the claims. And it's an ancillary step to the invention. It's really the transmission. The claims are all really directed at the mobile device. Some of the claims start with the free and bold. What is the role in 271A, B, or C of a word like ancillary? I'm not sure I understand the question. And you said this in your brief too that some of these steps are kind of ancillary to the main invention and I don't remember that being a concept that is involved in either 271A, B, or C. This mostly comes up in the reasonable potential for the indirect infringement claims. Judge Gilstrap completely refused to look at how central MySnap was to the claimed invention or how important it was to the critical elements. And that's completely contrary to ED Texas case law and Fed Circuit case law. We cited the SafeNet case. It says, for the patentee, and quote, for the patentee to say it has no controversy with the supplier when the supplier's product forms a central basis of its infringement theory is disingenuous. And then in the DataTurn case, it was an indirect infringement. In the indirect infringement part of DataTurn, this court looked at the documentation for several key limitations. So you only looked at the key limitations, not all of the – ancillary is my word for insignificant post-processing step or an insignificant pre-processing step. If this were a 101 case? Yeah, it's not the heart of the invention. And I think here, for the reasonable potential, we've shown that MySnap has been alleged by USAA to perform the majority of the claim elements, the real heart of the inventions here. And that seems to be what you're seeking a declaratory judgment on, a declaratory judgment that your software doesn't infringe or meet the limitations of the most significant limitations. You're almost looking for a partial non-infringement based on what you see as the most important limitations. Well, in order to establish – And I don't know if we've ever said that you can get a declaratory judgment in that way. In order to establish declaratory judgment standing, we're actually – I mean, obviously, we are seeking a declaratory judgment of non-infringement. So we do not have to prove for the purposes of standing that we infringe. That wouldn't make any sense. And I think you guys – the panel has already articulated that in the first opinion. We do believe that we have well-founded reasons why MySnap can never infringe under any circumstance, by any user, under any of its programmed capability. It's just on these particular four patents. So we will be seeking – we will be able to prove at the trial that MySnap can never infringe under any arrangement. But just for this threshold issue on the Rule 12 motion that we're dealing with today, standard is just a reasonable potential that these claims could be brought. So that's why we looked at the centrality of MySnap to the infringement allegations, to USAA's affirmative acts against all of our customers. Suppose one looked at the course of conduct by a patent owner here and came to the conclusion that they are making a studious effort not to ever accuse you of infringement. What about declaratory – what is it about the Declaratory Judgment Act that suggests, at least coupled with your asserted belief that you could never infringe, what about the policy of the Declaratory Judgment Act suggests that in that context, there should be a D.J. action? Well, there's much case law that says affirmative threats are not required for declaratory judgment standing. I think that was even cited in the first case. Right. I went beyond the absence of an affirmative threat. And there has been – It's really quite clear that they are not going to sue you. Well, if that was quite clear, then the question from the last panel, why are they not offering us a covenant not to sue? It's only four patents out of many of the patents. We'll ask them again. If we could get a covenant not to sue, we could all just go home. I thought that was part of what was on the table, or just off the table, that there is a concern, worried on the other side, maybe not so worried, maybe even affirmatively desired on yours, that such a covenant would have dramatic downstream consequences based on the exhaustion doctrine. Does that play a role here? That may be one of their concerns, but in our view, that's what we're entitled to, if we really want this declaratory judgment action to go away. We're only asking for a declaratory judgment action on behalf of our customers for use of our product. We're not asking for a declaratory judgment action on behalf of our customers for anything else that it does. If it uses somebody else's product and infringes the patent, that's clearly not what we're asking for. Their whole concerns about unwieldiness don't really make sense to us. We have all of the documentation to show how MySnap works. We have all the documentation that we provide to our customers to show how we could allegedly be inducing other people to infringe. Everything is within our realm. We don't plan to subpoena or join any third parties to this case. Mr. Mack, let me ask you. You're talking about basically the discretionary ruling now. You're getting into that, I guess. We've been talking mostly about A, B, and C of the infringement statute. Assume for the moment that you have to hang your hat on indemnification. I guess we have the indemnification provision at Appendix 1663, correct? Yes. Paragraph 10. What is the precise language in there that you say puts you on the hook? I'm thinking in terms of the one very specific claim that you hang your hat on is the, I guess, the Jack Henry issue. That's the Jack Henry agreement. What is the provision in paragraph 10 that creates risk of infringement charge for you? It's a good question, Judge Shaw. Just for the record, there's five different indemnification agreements now on the record post remand. I'm sorry, there's seven different agreements, all with slightly different scope and different language. But I'm focusing on the Jack Henry because that's the one where we have letters coming in, a letter coming in from Jack Henry saying, and then pointing to the additional letter. And the letter, just for the record, is Appendix 1717, and you can see there it's the General Counsel of Jack Henry who actually, he subjectively believes that my deck is required to identify. And then there's the epicenter law. Well, what is the provision, what is the language of paragraph 10 that you say really puts your client on the hook? And it's important to note that in the blue brief, they actually elide the most important part of this. So there's an exclusion here that the district court really picked up on, and they said that this exclusion in the district court's view would apply. Clearly incorrect. Again, what is the provision in here that you say creates a problem for your client and creates potential indemnification liability? Certainly. If you look at Section 10 of Appendix 1663, 10A, the first part is a really broad indemnification clause. 10A, my tech shall defend. The exclusion that the district court and USAA hang their hat on is the next sentence, in the middle of the paragraph where it says my tech will on the right-hand side. My tech will have no liability to JHA here under if. And then if you go down, they stop right after devices or software not supplied by my tech, and then that's where they end their quote, and they completely elide the rest of the statement, comma, except as part of the integrated JHA solutions. And that's at the bottom of page 38 of the blue brief. Extremely misleading quote because that's the key part. Let me ask you the first part. The first part says my tech shall defend, indemnify, and hold harmless, et cetera. And after the print, relating to or arising from any third-party claim or allegation that all are part of the my tech products, then there's a parenthetical other than arising solely as a result of the use of the my tech's products in connection with the JHA solution components in integrated solution. What does that mean? What is that parenthetical doing? Yeah, that parenthetical, when you read it in connection with the next sentence, that's indemnity liability arising solely out of combining it with the second product. So say I had a patent claim that had five elements, and all five elements were performed by the second part of the product, but zero elements were performed by the my tech product. That would be solely performed by the second products. That's what that means when it says solely. My tech's really not performing any of the limitations there. That parenthetical actually hasn't been raised. Can you understand how a reader, maybe me, would be a little confused by that parenthetical and then the accept clause that you're relying on in the second sentence? The second sentence accept clause that you like, except as part of the integrated JHA solutions, seems to conflict with this parenthetical other than arising. I understand that. That parenthetical actually I don't think has been raised by either party, but it is this next part that makes it more clear that we will have liability as to the integrated JHA solutions and the integrated solution. I mean, all we're looking for is reasonable potential. The accept gives you liability, you say? Where it has comma except as part of the integrated JHA solution because it's my tech will not have liability for any combinations except for combinations as part of the integrated JHA solution. That means we do have liability. That point which you brought to our attention a few minutes ago, Mr. Mack, that's what you say creates the liability issue, indemnification liability. It's only a reasonable potential at this stage. So even if there are ambiguities, Judge Chen, if there's ambiguities in a legal document, you look at extrinsic evidence. You accept jurisdiction. You have the depositions. You figure out what the parties meant when they drafted this. This accept clause in Section 10A, did you raise it below? The accept clause we pointed out in our yellow brief, yes. Below, to the district court. To the district court below. You definitely didn't bring it up in your blue brief. I know that. It didn't come up in this appeal until your yellow brief. So, therefore, at the moment we don't know what the other side has to say. Yes. So the post-remand brief, our main post-remand brief is Appendix 1606. Judge Gilstrap afforded the parties full briefing. And we did cite this. Discuss the impact of the accept clause in your A1606 post-remand brief. We quoted it at Appendix 1613. And we bolded, we quoted 10A on page Appendix 1613. I'm not sure if we specifically, since the accept part clearly would implicate MITAC, I'm not sure if we explained that in detail. I'd have to go back and look at the post-remand briefing. I'm not as familiar with this. I'm more familiar with the blue-red. You're saying, Mr. Mack, that at 1613 is your briefing on this question in the district court, correct? That's correct. This way. Maybe if I'm, from what I understand, Judge Chen is asking you, where in there do you mention the accept clause that you've pointed us to as being important today? Is that Judge Chen's question? That's Judge Chen's question. Yes, 10A is quoted here. I'm just trying to find- Not that clause. Trying to find- All right. Did you each just get one brief? No. Obviously, Judge Gilstrap relied on the carve-out. So did you have, I assume the others had pointed out this carve-out. Did you have an opportunity to say, oh, here's why the carve-out is- We did, and there is a responsive brief to this that I don't have it printed out right now. But there was a full round of briefing on both sides. I think there were four briefs total on each side. Are you representing, and I'm not obviously holding it. This is maybe what your recollection is, and I apologize, Mr. Mack. But can you represent to us that the accept clause that you pointed out to us today as being important was a matter that was before the district court? I can confirm- Based on your recollection. My colleague can confirm that. We could look up the reply brief that goes along with Appendix 1606. I would imagine it would be because these identification provisions were discussed at length in the post-remand briefing. It was raised, that accept clause was raised for the first time in the red brief, and that's why we responded in the yellow brief. One other question. Behind this, we have this letter, this communication from this entity, Epicenter Law, and that was what apparently led Jack Henry to send the letter to your client. Now, I know that I think in the briefing that USAA says Epicenter Law isn't us suing for infringement or anything like that or threatening. But who exactly is Epicenter Law, and what is their role in this situation? Epicenter Law was USA's licensing council. They were the ones that sent out the thousands of letters. They were based in the Bay Area. That's why this case was originally filed in the Bay Area. It was transferred to Texas, unfortunately. But Epicenter Law is their licensing council, the one that was responsible for putting all of our customers on notice of these patents. Is there anything in the record that shows what is the indemnification obligation of JHA, of Jack Henry, for whatever clients it has that received a letter from this law group? So the Jack Henry cover letter at Appendix 1717, it kind of explains what happened here. I don't know if you understand how Jack Henry operates. I'm the middle man. Mytek is a small software company. Jack Henry is a larger company. They act as Mytek's licensing agent. They're actually authorized to license MySnap on behalf of Mytek. They also work with the banks themselves to develop the software. Part of the exercise here is trying to figure out what is the nature of the indemnification obligation of your client. And I think when we're going through this chain here, it would be useful to see the other half of that chain, which is the indemnification obligation of Jack Henry to these clients that received these letters. So the Jack Henry agreement contemplates indemnification over the integrated solution, and that is the solution that is provided to the clients. Some of the indemnification agreements specifically say end users are also indemnified. There are several of those in the record. The Jack Henry one doesn't use the word end users, but it's inferred through the use of the integrated solution that it would cover the end users. And if you look here at Appendix 1717, the letter, the Jack Henry General Counsel says, Jack Henry has received a claim by Q2 Banking of indemnity related to the remote deposit products. Q2 and several other Jack Henry customers have received the attached letter from EpiCenter Law postulating infringement of 50 or more patents owned by USAA. So they say received, so Jack Henry has received a claim by its customers, and then pursuant to Section 10 of the agreement, MiTech has certain indemnification obligations with respect to Jack Henry in connection with these claims, referring back up to the claim brought by the end user, and any related claims. So it's pretty clear from this letter and Jack Henry's interpretation that the obligations of MiTech would also cover the obligations of the end user. But even if there were, you know, it wouldn't be uncommon for the middleman to also have an indemnification agreement in addition to the standard UCC indemnification type that's required of the end user product that would flow back to Jack Henry, and then MiTech would indemnify Jack Henry. That's also a very common scenario in this, in software generally. But I don't think that defeats the reasonable potential in any way. We would, I mean, it would just, there's just one intermediary link. There's no broken link. It's just one step in the link. Okay. We're well over your time. I'll restore your rebuttal time, but we'll hear from the other side. Thank you, Judge Strong. Thank you. Good morning, and may it please the Court. Lisa Glasser on behalf of USAA. Are there IPRs going on with these patents? There are, and there was actually an opinion issued an hour or two ago affirming the PTAB's final written decision with respect to the actually only two of these patents that have been litigated through judgment. So how does that affect this case? So this, I would imagine if this Court were to do what we think is not the correct result, which is to find that there is jurisdiction at this moment, and additionally that the District Court abused its discretion in declining jurisdiction, that would go into the bundle of mix of facts for the District Court to now again consider on remand because there have been a number of changed circumstances that we think yet further completely eviscerate this idea that there's somehow a reasonable apprehension of suit. Other new facts in the mix, of course, include the fact that there's, at this point in time, not for several years been any new active litigation involving these patents. Okay. So the 571 and the 779? Correct, Your Honor. Are there still claims alive in those that survived the IPR? Yeah, my position would be that it's not at final judgment yet. Not final judgment, I understand. But it was all- It didn't cover all claims? It did cover all asserted claims of those patents. Okay. All asserted claims, I'm sorry. All claims of the patent? All of the claims that MITAC has identified in its brief here and all the ones that have ever been asserted against anybody. And what's happened again at the IPR with respect to those? There was a final written decision of invalidity and this morning that was affirmed. Yes. In a non-precedential opinion. And then what about the 090 patent, which is the other patent at stake here? Is there any pending IPR there? There is no pending IPR on that patent. The 090 patent has one other notable effect that I think, again, it's sort of on the mountain of reasons why there's no reasonable apprehension. The 090 patent actually was the only one of these patents that was not even mentioned as an attachment, even just noted in passing in any of these letters that went out to the banks that the prior panel found were just enough, just barely enough, to potentially create a reasonable apprehension of suit on behalf of any entity that received the letter in 2017. Of course, eight years gone by now, I don't think there's any reasonable apprehension by those entities in any event. But the 090 was actually not even part of those letters at that time. And the 517, what's the status of that? 517 is not part of any lawsuit. It's not part of any of these IPRs. It's just sitting there issued at this point in time. Okay. Would you mind answering the question that came up about whether the exception to the carve-out sentence in the Jack Henry Section 10A was brought to the district court's attention? So, Your Honor, I do not believe that MITAC ever made that argument in the district court. And one of the reasons why I say that is that I think we would have gone down a whole separate path of discussion with the district court if that had been their argument. Because the other problem with that argument is the fact that it hangs its hat entirely on this term. I think the term is integrated JHA solutions. And MITAC didn't even submit the part of the agreement that defines what's included within that. And so I believe, Your Honor, and I am the one who handled that argument along with my colleague, Mr. Mack, that that would have become certainly an issue of us asking, well, if that's your argument, what is that? So I think that's the issue there. With respect to JHA, though, the larger issue is this court laid out in detail what the actual test is when we're talking about indemnity. And the question is not, is there some indemnity agreement out there somewhere that could apply if there was a claim. As this panel explained in the prior decision and in several prior decisions of this court as well lay out, this is all a concept about whether MITAC can actually step into the shoes of a specific entity that itself has standing. And so the idea isn't, could somebody out there someday assert an indemnification claim? Question number one, as this court laid out in the decision, was, is there a third party who at the time of the complaint and all the way through today has themselves a reasonable apprehension of suit from USAA on these four patents? If the answer to that is no, we stop. If the answer to that is yes, we then go to the separate question of saying, well, is there a reasonable potential for MITAC to have to indemnify that party? It's undisputed on this record that the only entity that both received a letter at the time of suit and has any sort of contract with any indemnity in it is nobody. JHA is literally the only entity who received any letter at the time of the lawsuit. JHA had no apprehension of suit. There's no argument that they apprehended suit. If anything, there are a couple steps removed. But I guess the question is whether JHA potentially stands in the shoes of its bank clients that received this letter at the center. And so therefore, perhaps, you know, if there's an indemnity obligation there, then they do stand in those shoes. And then, you know, go one level up the chain, then likewise, arguably, MITAC stands in the shoes of JHA. Yes, there's an interesting sort of unsettled question of, can you ever have sort of a daisy chain standing in that respect? I don't think this court has ever addressed that. Here, the issue isn't presented because we have the entity, JHA. We know they didn't reasonably apprehend suit. They're the only ones with any indemnity agreement in the record. Why do we know that they have no reasonable apprehension of suit? There's absolutely no evidence whatsoever in the record that USAA has ever contacted JHA, that JHA has ever said that itself it believes it would be sued. Well, then the Jack Henry, well, according to their letter at 1717, Jack Henry has received a claim by Q2 banking of indemnity related to remote deposit products. So they are saying they've received this indemnity demand by the bank. Right, and we don't know what that was. We don't know what's going on with Q2. I don't think Q2 actually received a letter. Certainly, this is MITEC's burden, of course, to show all of these facts for jurisdiction. MITEC put absolutely nothing into the record suggesting that JHA or even this Q2 or whoever is this bank whose name they chose to redact out on the letter, that's their burden to show. And so even if it's an interesting question, right, if theoretically under some scenario you could daisy chain the indemnity. I guess another interesting question is how deeply do we have to go into the merits of whether there is, in fact, a legal indemnity obligation before concluding that there is standing here. Yeah, and here I think you just don't because there's absolutely no evidence. Yeah, but before we reach that conclusion, we first have to ask ourselves how far down the rabbit hole should we really be going. And maybe we should just stop at the fact that there is this indemnity obligation and that there is this allegation from JHA that its clients have demanded indemnity. So I guess what I'm trying to figure out is at what level do we go in terms of reaching this question. We certainly shouldn't go all the way to the merits. Yeah, and I think this court's prior decision and as well the data turn decision do answer that question in saying it's not enough for there just to be pointing to an agreement. You do have to look at the merits, and you do need to find a reasonable potential of indemnification liability, again, most importantly, to some specific entity. And this in part is just a fundamental issue on whether there's jurisdiction. It also gets a little bit into the discretionary denial because if you ever had a situation where you found A, there's a third party who itself has a reasonable apprehension, and B, MITAC has a reasonable potential of having to indemnify them, they get to proceed on their suit against USAA. But that suit would be focused on the entity itself who has the reasonable apprehension and MITAC essentially jumping in to defend them. Judge Toronto asked an interesting question, legal question, as to the ordering of how to think about the issues confronting us. Do we need to first satisfy ourselves that there is a case or controversy before touching Judge Gilsrapp's second backup grounds for dismissal, which is to say that he also concluded that it's best to exercise his discretion to not take the case? Your Honor, we actually looked at that issue as well because I think the discretionary denial one is much more straightforward in a lot of ways, and in the evidence they're quite overwhelming. We saw no indication in Supreme Court precedent or precedent of this court saying that you would need to first actively find a case in controversy before you could consider whether a district court acted within its discretion in declining jurisdiction. And it logically, I think, makes sense that you could take it in either order, the reason being the entire purpose of it is just to find out, is there a basis for the Declaratory Judgment Act to be invoked in this particular scenario? Of course, for us as parties and for the district court, it was prudent to walk through all of the arguments because we want to have a complete record and address all of the issues, but fundamentally the question is, is the Declaratory Judgment Act here properly in play? And whether you get there through the district court saying, I would decline any jurisdiction that might exist because as a matter of my docket management, as a matter of my analysis of the facts, it would be wholly inefficient to proceed that way, or whether you get to that avenue by saying there's no set of facts under which you could have standing in the first place. Again, I don't think there is a case directly on point, but that certainly is what makes sense to us, Your Honors. At this point in time, USAA has taken a long, hard look, because it's had to, at MITEC's conduct. USAA must have certainly arrived at a conclusion now as to whether it thinks MITEC is directly infringing or indirectly infringing its patents. So what's USAA's position? Do they believe MITEC's infringing or indirectly infringing these patents? Your Honor, from what we have seen litigating against these three banks in court, our understanding is the same as what MITEC told the PTAB expressly, which is that it appears that the MITEC software itself, as sold, does not satisfy every element of these claims. That's direct infringement. How about indirect infringement? And we've obviously never dug under the hood, but we have never put forth any sort of allegation that it is MITEC who is directing any of these banks who are infringing. What are the chances USAA is going to issue MITEC a covenant not to sue by the end of the week? The reason why I think USAA wouldn't do that, most likely, is twofold. One, we are, within our rights, as this Court has laid out before, we're not going to be coerced by a party who files a non-meritorious declaratory judgment act into being demanded to provide a covenant. This Court's precedent makes clear that that is not required. In fact, the cases where that ends up being weighed to any significant degree, typically, I think actually always, are cases where the patentee has actually approached the entity and said, hey, let's talk about licensing, let's talk about a problem with your product. In that situation, it makes sense. Here, we're on our own, minding our business, bringing litigations in several discrete instances against major competitors. Ms. Glasser, let me ask you, just before your time runs out there, it came up a little bit in our discussion with Mr. Mack, but the Epicenter letter, I believe Mr. Mack said, correct me if I'm wrong, that Epicenter was a licensing agent of USAA? I don't think I would disagree with that discussion. Does it work that USAA says, as the first step in a process, say, oh, we think something's going on, go out and send a letter to Jack Henry. Is that the way it works, or someone else? Yes, so no letter, to my knowledge, has ever gone out to Jack Henry. I thought they said they got one here. No, that was sort of one of the points I was trying to communicate, which is Oh, I see. They didn't get a letter. They're the only ones who ever sent an indemnity request, and they did not get a letter. My understanding of the letters is that Mr. Epstein, back in 2017, sent letters to a number of banks, actually. I see, okay. Jack Henry does business with the banks, so that the bank would maybe then go after Jack Henry. Is that the idea? It's not at all clear from what they put into the record. It sounds like what they're trying to say is that a bank received a letter, and they won't say who that bank was. That bank reached out to somebody else. I think there's a typo in the letter, because I don't think there was a letter that went to Q2. But it sounds like a bank reached out to some company called Q2. This company called Q2 reached out to JHA. Obviously, this was all eight years ago. Nothing's happened to any of these entities in the last eight years. I don't think there's any plausible argument that anyone is reasonably apprehending a suit at this moment in time from that particular letter. Does that answer your question? No, I think that does, yeah. Thank you. I see that I'm into the red. Does the panel have further questions? I don't think we do. Thank you, Your Honors. We actually don't know the extent of the letter-writing campaign, because they have never produced the letters. We've asked for them, and they haven't produced them. There was some e-mail correspondence between counsel. We were going to produce all the indemnification correspondence, and they were going to produce all of their letters. And the counsel just refused. The communication went silent. And the discovery is not open in the declaratory judgment action. So we actually don't know who they sent the letter to. We know that they sent 1,000 letters. We assume it was all the banks. They've also suggested in their briefing, and they told this court that they never sent a letter to Truist Bank. We think, again, that's sleight of hand, because Truist Bank actually merged from BB&T and SunTrust. In the district court on remand, did you request discovery just for jurisdictional purposes? A briefing was allowed. I don't believe discovery was permitted. So we actually don't know, and they're not entitled to use that as a shield and a sword. They obviously know who they sent letters to. We think it was the entire industry. The one thing we didn't talk about, I mean, the Truist Agreement actually doesn't have – the only carve-out in the Truist Agreement is modifications or alterations to the software itself. That actually – MiTek sends – Did you waive reliance on the Truist Agreement? The Truist – so the Truist Agreement was in full force. MiTek knew that it was in full force. I'm just remembering a little colloquy between you and Judge Gilstrap about the Truist Agreement. Yeah. Where you seem to believe that it's not something you could rely on, and you seem to agree with that. That's taken out of context. The USAA raised that in its red brief, and I didn't see you respond to it in your gray brief. That's taken out of context, Judge Chen. Judge Gilstrap said the filing of the Truist lawsuit would have initiated your reasonable apprehension. Again, he kept going to the wrong standard, the reasonable apprehension standard. And if you look at my answer, I said we actually are relying on that to heighten our reasonable apprehension. But that's because the request came later. But MiTek knows that it has indemnification obligations and agreements with all of its customers. We know that. We knew that as of the time of filing our DJ complaint. We don't have to wait until someone sends us a demand before we can file a DJ complaint. Most of the time, people wait until they're sued to send a demand. So the microchip case, the Federal Circuit's microchip case, says that the existence of the agreement is really what's relevant. We knew we had an agreement with Truist. We knew that Truist or Truist's predecessors, SunTrust and BBT, were sent letters by Epicenter. That's all that's required. This Court has already found that each of MiTek's customers that have received letters have standing to sue. Except clause in Section 10A of the JHA agreement. Did you double-check your post-rematch briefs? It did come up actually at the hearing in front of Judge Gilstrap. It was Appendix 2494, lines 19, 7 through 14, and we explained why. 2494. Okay. It didn't come up in any of your briefs. No. I tried to look and I didn't see it anywhere in either post-rematch. We wouldn't have cited it because we cited the overall provision that provides for indemnity. We wouldn't have cited a carve-out that doesn't provide. So you're saying, Mr. Mack, I just want to make sure in response to the question from Judge Chen, you're saying that the except clause that you pointed to that provides your hook for indemnity liability came up at Appendix what page again? I believe it came up at the hearing in front of Judge Gilstrap at Appendix 2494. 2494. We found it at 19, 7 through 14. Lines 19. Is it page 19? Page 19, lines 7 through 14. Okay. This is Judge Gilstrap speaking, right? I believe so. I don't have it in front of me. That's the first time it came up. And again, because it's a carve-out that we don't think applies, we would have probably not cited that. We cited the entire provision, 10.1, but I don't think we specifically cited that carve-out. And again, I said this last time I was here, but MyTech is a small software company. We were prevented from filing IPRs on a discretionary basis. Judge Chen, you probably understand the discretionary denial of the PTAB. They said that we were so close to Wells Fargo with our interests that our petition was an unfair follow-on petition to Wells Fargo's petition. So we were denied our chance in front of the PTAB for invalidity. And then now USA is trying to deny our chance at the district court for non-infringement. So we really will be prevented from any avenue of addressing our grievances here if jurisdiction doesn't stand. Thank you. Thanks to all counsel. Case is submitted.